IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| DONNA STARBUCK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | 11-3272-CV-S-REL-SSA |
| MICHAEL J. ASTRUE, Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Donna Starbuck seeks review of the final decision of the Commissioner of

Social Security denying plaintiff's application for disability benefits under Titles II and XVI of

the Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in not giving controlling

weight to Dr. Joan Bender, in deriving a residual functional capacity that does not reflect

plaintiff's limitations, and in finding plaintiff not credible. I find that the substantial evidence

in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore,

plaintiff's motion for summary judgment will be denied and the decision of the Commissioner

will be affirmed.

## I.    BACKGROUND

On September 2, 2008, plaintiff applied for disability benefits alleging that she had

been disabled since February 1, 2008. Plaintiff's disability stems from fibromyalgia, lower

back problems, breathing issues, depression, anxiety, and concentration problems. Plaintiff's

application was denied on November 7, 2008. On April 5, 2010, a hearing was held before an

Administrative Law Judge. On May 21, 2010, the ALJ found that plaintiff was not under a

"disability" as defined in the Act. On June 14, 2011, the Appeals Council denied plaintiff's

request for review. Therefore, the decision of the ALJ stands as the final decision of the

Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than

2

twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.     Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.     Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.     Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.     Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes = go to next step where burden shifts to Commissioner.

5.     Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

IV.    THE RECORD

The record consists of the testimony of plaintiff and vocational expert George Horne, in addition to documentary evidence admitted at the hearing.

3

*A.* *ADMINISTRATIVE REPORTS*

The record contains the following administrative reports:

**Earnings Record**

The record establishes that plaintiff earned the following income from 1981 through 2009:

| Year | Earnings |
|------|----------|
| 1981 | $ 4,515.51 |
| 1982 | 3,011.23 |
| 1983 | 0.00 |
| 1984 | 3,666.46 |
| 1985 | 2,291.93 |
| 1986 | 5,586.75 |
| 1987 | 6964.13 |
| 1988 | 4,661.33 |
| 1989 | 2,168.30 |
| 1990 | 4,147.97 |
| 1991 | 6,089.44 |
| 1992 | 6,698.30 |
| 1993 | 4,907.52 |
| 1994 | 1,423.39 |
| 1995 | 0.00 |
| 1996 | 0.00 |
| 1997 | 426.36 |
| 1998 | 10,774.26 |
| 1999 | 8,479.66 |
| 2000 | 11,729.00 |
| 2001 | 14,609.00 |
| 2002 | 16,148.00 |
| 2003 | 15,491.00 |
| 2004 | 11,464.00 |
| 2005 | 10,288.00 |

4

|      |           |
|------|-----------|
| 2006 | 12,130.00 |
| 2007 | 12,372.00 |
| 2008 | 12,060.00 |
| 2009 | 0.00      |

(Tr. at 128-133).

**Work Activity Report**

Plaintiff described her present work activities: "I use[d] to have 25-30 customers and 4 business customers. Now I only have 15 houses and one business total. We clean 12 houses in one week and 1 business in a week. Before my business I had two employees, now I only have one as one quit. My business went down because I did not have enough workers to clean for me and I am unable to do as much due to my disability. Presently I do the scheduling of my employees and what houses to clean. I still buy the supplies, pick up the supplies, etc. I don't do any advertising." (Tr. at 134). I note that plaintiff's earnings record do not show a more-than-50% decline in income which would reflect this more-than-50% decline in business.

**Function Report - September 16, 2008**

In a Function Report dated September 16, 2008, plaintiff described her day:

Depends on how bad I hurt that day. If I'm not hurting too bad: get up at 5:30 AM, wake the girls up, fix breakfast, take a shower, go help clean for 1-3 hours, come home, lay down till 5 pm, fix dinner, clean kitchen, straighten up the house, go to bed at 10:00 pm but don't go to sleep till 1-2:00 am.

(Tr. at 172).

Plaintiff reported that she cooks and does laundry for her kids and takes care of a pet. Before her disability, she was able to mow her yard with a push mower, clean for many hours a day, lift pretty much anything. "I had no limits." She has no problems with personal care, she prepares meals, she can clean and do laundry but not in the same day. She cleans for 4-6 hours and does laundry for 1-2 hours. She can mow her yard with a riding lawn mower. Plaintiff drives, shops, watches television, plays computer games, bowls, and goes fishing. She

5

only bowls or goes fishing when she is not hurting.  She wrote that she had not been bowling or fishing for the past year (i.e., since approximately September 2007) because of pain in her back and shoulders (Tr. at 176).

Plaintiff's impairments limit her ability to lift, squat, bend, stand, reach, walk, sit, climb stairs, see, concentrate, and complete tasks and it limits her memory (Tr. at 177).  Her impairments do not affect her ability to kneel, talk, hear, understand, follow instructions, use her hands, or get along with others.  She likes to keep to herself instead of being around a lot of people, she does not handle stress or change well, and she can pay attention for 30 minutes.

Plaintiff said she could lift nothing over 20 pounds, squat only for a few minutes, bend for a few minutes, stand for 20 minutes, reach one time per day, walk for 20 minutes, sit for one hour, and climb stairs one time a day (Tr. at 178).  She never finishes anything she starts because she gets sidetracked or bored.  She cannot read a book or watch television for much more than 30 minutes because she starts doing other things or thinking about other things.

### Function Report - July 15, 2009

In a Function Report dated July 15, 2009, plaintiff described her day:

> On a good day, I get up at 5-7 a.m. Get dressed, fix me breakfast. Go help clean for 1-3 hours.  Come home lay down. 5-6 pm fix dinner with my daughters' help.  Do 1 load of laundry. Lay around and go to bed at 10:00 p.m.  On a bad day I wake up at 10-11 am, eat something, lay back down, sleep off and on till 3-4.  5-6 fix dinner, lay around till 10 pm and go to bed.  I have about 3 days a week that are bad.

(Tr. at 196).

Plaintiff said she takes care of two daughters -- cooking and doing their laundry -- but she has their help.  She feeds, waters, and takes her dog outside.  She has no problem with personal care.  She prepares meals daily for 15 to 30 minutes.  She can do laundry and clean her house.  She does laundry 30 minutes a day five days a week. She cleans her house for "1 hour 1 time a month" (Tr. at 197-198).  She is able to drive a car and shop.  "Because of my depression I buy things I can't afford." (Tr. at 200).

6

B.    *SUMMARY OF MEDICAL RECORDS*

On July 31, 2007, plaintiff saw Mark Chambers, M.D., to discuss her diabetes (Tr. at 238). She reported doing quite well. Her behavior and affect were appropriate and she denied experiencing any pain or weakness in her back, muscles, or joints. Her lungs were clear to auscultation and her respirations were even and unlabored. Dr. Chambers found that plaintiff's diabetes was controlled and he recommended that she exercise.

On January 28, 2008, plaintiff returned to Dr. Chambers's office and complained of pain in her back and left shoulder (Tr. at 235-236). She also reported some mild and underlying depressive symptoms, but denied experiencing headaches, memory problems, an anxious mood, or attention difficulties. On exam, plaintiff's behavior and affect were appropriate, her lungs were clear, and her respirations were even and unlabored. She exhibited pain in her back muscles, but had a normal range of motion in her back and all of her extremities. She also had a normal gait and good muscle strength. Dr. Chambers assessed fibromyalgia and found that plaintiff's diabetes was controlled. He recommended an exercise program, but plaintiff was "not keen" on that idea, so he told her to continue with heat, non-steroidal anti-inflammatories, and Zoloft for her fibromyalgia symptoms.

February 1, 2008, is plaintiff's alleged onset date.

On April 28, 2008, plaintiff saw Dr. Chambers and reported doing well (Tr. at 233). She said Zoloft had initially improved her fibromyalgia, but her pain had recently worsened. On exam plaintiff's behavior and affect were appropriate; her lungs were clear to auscultation and her respirations were even and unlabored; her gait and strength were normal; and she had normal range of motion in her back and all of her extremities. Dr. Chambers assessed improved fibromyalgia and controlled diabetes. He increased plaintiff's Zoloft prescription and advised her to exercise.

7

On May 7, 2008, plaintiff was seen by Joan Bender, Ph.D., for a psychological evaluation to help determine eligibility for medical assistance (Tr. at 212-214). Dr. Bender noted that none of plaintiff's records were available for review.

Background Information: . . . [O]ver the past 5 years she has had increasingly severe pain, and . . . she has been diagnosed with fibromyalgia. She has severe back pain, with knots in her muscles, daily headaches (she has had headaches since she was 17), type 2 diabetes, arthritis in her neck, and insomnia. . . . She takes the following medications: Zoloft 10 mg [antidepressant]; Metformin 500 mg [for diabetes]; and Naproxen 500 mg [non-steroidal anti-inflammatory] as needed. She is not aware of having any side effects. . . . In 1997, her sister wanted her to take over the sister's house cleaning business, and Donna did so. She did all the work herself for a number of years, until her pain got too severe. Currently Donna's 24 year old daughter does the cleaning along with another employee. Donna helps a little a few days a week, and runs the business. Donna is having financial problems. Another stressor is that her 22 year old son is probably going to prison for drug charges. Donna was married for about 20 years and has four children. She has had a boyfriend for the past 8 years.

Daily Activities: . . . On the weekend she may go to a garage sale or flea market, does the grocery shopping, and may eat out with her boyfriend. She also bowls one night a week.

Mental Status: Donna arrived early for the appointment and had driven herself. . . . She was able to give history without significant memory problem, and gave logical, goal-directed answers to questions. . . . She was given some items from the vocabulary, Similarities, and information subtests of the WAIS-III. She showed estimated borderline word knowledge, ability to think abstractly, and general fund of information. She was given the modified Mini Mental Status Exam, and scored 51 out of a possible 57 points. This does not suggest cognitive impairment. She was oriented, was able to recall 3 of 3 named items after 5 minutes, showed borderline immediately auditory recall, made one error in the first five serial 7 subtractions from 100, could add change in her head, spelled "world" backward correctly, could read and write, named pictured items, followed a simple 3-step directive, but had some trouble naming recent U.S. presidents and with reproducing a simple visual design.

Summary and Diagnostic Impression: Donna Starbuck is a 45 year old woman with fibromyalgia and headaches, chronic severe pain and fatigue, and type 2 diabetes. Donna meets the criteria for Major Depression, Recurrent, moderate; and Generalized Anxiety Disorder. Her intellectual functioning is likely borderline.

Donna is able to understand and recall simple to moderately complex instructions. She does not appear able to concentrate or persist on such tasks for full time work because of the distraction of pain. The depression and anxiety disorder are factors, but pain seems the primary problem in terms of disrupting her functioning. She could handle moderate contact with the public, coworkers, and supervisor. She could adapt to change and can manage her own funds.

8

Donna appears disabled for full time work because of the pain and trouble with movement. The psychiatric disorders do not appear disabling in and of themselves. She is likely to continue to be disabled for 12 months or longer or until her pain problems improve significantly.

On July 18, 2008, plaintiff saw Dr. Chambers who noted that plaintiff was "doing OK" (Tr. at 230-232). She was "not checking her sugars too regularly right now." Six months earlier her sugar was well-controlled. Plaintiff said she was under a lot of stress mainly because of her son. "He has had lots of drug addiction and now facing prison time and this has caused her a lot of worry. Zoloft working pretty well for her mood but still having lots of insomnia and problems initiating sleep." Plaintiff was a smoker and was having a productive cough. She weighed 175.5 pounds and was alert and oriented. Her physical exam was essentially normal. Dr. Chambers assessed bronchitis, tobacco dependence, diabetes "controlled", and insomnia. He told plaintiff she was going to need to quit smoking, but she said she was not ready for that. He ordered an A1c,[1] prescribed Ambien (sedative), and renewed plaintiff's albuterol inhaler[2] prescription.

On October 17, 2008, plaintiff saw Dr. Chambers and complained of wheezing, a cough, and fibromyalgia (Tr. at 350-353). Her diabetes was stable. She continued to smoke one pack of cigarettes a day. She exhibited faint expiratory wheezing, but her lungs were clear

---

[1]The A1c test is a blood test that correlates with a person's average blood glucose level over a span of a few months. The A1c test measures how much glucose is stuck to the patient's hemoglobin, or more specifically, what percent of hemoglobin proteins are attached to glucose. Once glucose sticks to a hemoglobin protein, it stays there for the life span of the hemoglobin protein, or for about 120 days. Therefore, the glucose attached to hemoglobin A protein reflects the level of blood sugar over two to three months. For a person without diabetes, a typical A1c level is about 5%. If a patient has diabetes, it is recommended by the American Association of Clinical Endocrinologists, that a level of 6.5% or below should be the target goal. The American Diabetes Association suggests a goal of 7% or lower.

[2]Albuterol is used to prevent and treat wheezing, difficulty breathing and chest tightness caused by lung diseases such as asthma and chronic obstructive pulmonary disease (COPD; a group of diseases that affect the lungs and airways). Albuterol is in a class of medications called bronchodilators. It works by relaxing and opening air passages to the lungs to make breathing easier.

and her respirations were even and unlabored. Dr. Chambers assessed chronic bronchitis, tobacco dependence, and fibromyalgia. He advised her to stop smoking and to exercise.

On October 31, 2008, plaintiff went to the emergency room and reported having difficulty breathing (Tr. at 328-329). She denied having any musculoskeletal complaints. She was given an Albuterol treatment.

On November 5, 2008, plaintiff went to the emergency room and complained of shortness of breath and cough (Tr. at 317-318). Her mood, affect, and behavior were appropriate and she denied depression or musculoskeletal complaints. A CT scan of her chest showed infiltrates in her right lobe consistent with pneumonia. She was admitted to the hospital and diagnosed with community acquired pneumonia, COPD exacerbation, and tobacco dependence. She was advised to stop smoking. She was discharged on November 10, 2008.

On November 7, 2008, Lester Bland, Psy.D., a state agency reviewing psychologist, completed a psychiatric review form (Tr. at 242-253). He found plaintiff's mental impairment not severe. He found that she had only mild restriction of activities of daily living; difficulties in maintaining social functioning; difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation.

On November 20, 2008, plaintiff saw Dr. Chambers for a follow-up on her pneumonia (Tr. at 347-348). She appeared in no acute distress and her behavior and affect were appropriate. Her lungs were clear and her respirations were even with no wheezing. Dr. Chambers again advised plaintiff to stop smoking.

Two days later, on November 22, 2008, plaintiff went to an urgent care center and complained of shortness of breath and pain with coughing (Tr. at 309). An x-ray of her chest

showed improving right basilar pneumonia (Tr. at 314). A CT scan showed that the opacities[3] were resolved in her right lobes, but had slightly progressed in the left lung (Tr. at 315). She was diagnosed with COPD exacerbation and chest pain versus dyspnea (shortness of breath).

On November 28, 2008, plaintiff went to the emergency room and reported that her pneumonia was getting worse (Tr. at 307-308). An x-ray of her chest showed that her lungs were clear. She was diagnosed with bronchitis[4] and bronchospasm.[5]

On December 1, 2008, plaintiff returned to the emergency room complaining of shortness of breath (Tr. at 291-295). She reported using multiple cleaning agents at her job and said one of the products caused her to feel short of breath.

> She was first admitted in early November with symptoms consistent with bronchopneumonia. She was treated with antibiotics and steroids. She was sent home on a gradual taper and did well for a few days until she had return of pretreatment symptoms. She then was readmitted in later November and treated again with antibiotics and steroids. This time she was sent home with a tapering dose as well as Advair. Once she completed her steroid taper she did not continue Advair. Two days ago she noted worsening shortness of breath and nonproductive cough similar to before and was readmitted. During the previous admission, CAT scans have demonstrated migratory pulmonary infiltrates with a ground glass characteristic. All cultures and serologies have been negative to date. . . . She denies arthralgias [joint pain], myalgias [muscular pain], or skin rash.

> The patient works cleaning houses and offices. She uses various agents including Pine-Sol, comet spray, furniture polish, and mold remover. She recently found a good product that she liked and had sprayed a lot of it in a shower that she was enclosed in for awhile. This caused her to be very short of breath and may have been a precipitating factor.

* * * * *

---

[3]The non-transparent part of a lung scan indicating pneumonia.

[4]An inflammation of the air passages between the nose and the lungs, including the windpipe or trachea and the larger air tubes of the lung that bring air in from the trachea (bronchi).

[5]An excessive and prolonged contraction of the smooth muscle of the bronchi and bronchioles, resulting in an acute narrowing and obstruction of the respiratory airway.

11

> A 14-point review of systems is negative with the exception of what was mentioned in the history of present illness.

(Tr. at 293-294). Plaintiff reported that she had quit smoking the month before. She had normal strength in her extremities and no musculoskeletal complaints. Her echocardiogram was normal. She was diagnosed with migratory infiltrates with hypoxemia[6] related to inhalational/chemical pneumonitis. She was discharged on December 4, 2008.

On December 18, 2008, plaintiff returned to the emergency room and complained of vomiting (Tr. at 288-290). Her breathing was observed to be even and unlabored. She had no respiratory or musculoskeletal complaints. She was diagnosed with vomiting.

On January 12, 2009, plaintiff saw Dr. Chambers for a follow up on her diabetes (Tr. at 273-274). "Patient denies pain relating to the reason for this office visit." She complained of intermittent bronchitis. She continued to smoke but reported that she was "trying to stop," which appears to be inconsistent with her recent emergency room visit during which she reported that she had already quit smoking. She reported no routine exercise, "poor dietary habits," and using caffeine twice a day. Plaintiff was alert and oriented; her behavior and affect were appropriate. She had a cough, but her lungs were clear and her respirations were even and unlabored. Her gait was also normal and she had normal strength and range of motion in her back and extremities. Dr. Chambers assessed tobacco dependence, improved pneumonia, chronic bronchitis, and controlled diabetes. He advised her to exercise and stop smoking.

Later that same day, on January 12, 2009, plaintiff saw Terrence Coulter, M.D., at Ferrell-Duncan Clinic for a follow up after her hospital stay (Tr. 282-283). She reported having a persistent cough but denied experiencing any pain. She continued to smoke a few

---

[6]Insufficient oxygenation of arterial blood.

12

cigarettes every day. Dr. Coulter recommended that plaintiff stop smoking and continue her current medication regimen.

On April 7, 2009, plaintiff saw Dr. Chambers for a follow up on diabetes (Tr. at 270-272). She reported occasional high blood sugar levels, but said her levels were generally OK. Plaintiff said her weight was up (it was 184 on this day) but that she had not been engaging in any regular exercise. She complained of fatigue and a fibromyalgia flare, but denied any musculoskeletal problems. "Denies: impaired function, arthralgias [joint pain], joint stiffness, swollen joints, hot joints, muscle cramps, weakness, back pain, sciatica. Admits to myalgias [muscle pain], trigger points." She reported some asthma type symptoms, but she was still smoking and said she did not want to stop. She was using her Advair inhaler only intermittently. She was also missing her evening doses of Metformin (treats diabetes).

Plaintiff was alert and oriented, in no acute distress and her behavior and affect were appropriate. Her lungs were clear and her respirations were even and unlabored. Her gait was normal and she had normal strength and range of motion in her back and extremities. Dr. Chambers advised plaintiff to stop smoking and to comply with her medication regimen, diet, and exercise.

On July 7, 2009, plaintiff saw Dr. Chambers for a follow up (Tr. 267-269). "Doing OK on meds including her glucophage [treats diabetes]. However, home glucose intermittently running 140-200's range. This has been higher than normal for her. She is off Amaryl [treats diabetes] and I'm really not sure why!?" She reported ongoing chronic cough and wheezing, but she continued to smoke and "not taking her Advair much at all." She complained of intermittent right upper quadrant pain.

On exam plaintiff was alert and oriented, her behavior and affect were appropriate, her lungs were clear to auscultation and her respirations were even and unlabored. She had a normal gait, normal strength, and a normal range of motion in her back and extremities. An

13

x-ray of her chest showed no suspicious findings (Tr. at 257, 358). Dr. Chambers advised plaintiff to stop smoking and to exercise. He concluded that plaintiff's symptoms would progress if she continued smoking and did not take her medication. He stated that her right upper quadrant pain would resolve if she lost weight.

On September 29, 2009, plaintiff saw Dr. Chambers for a follow up on diabetes (Tr. at 285-286). She said her blood sugar levels were occasionally high, but she was doing well. She had occasional wheezing and morning coughs and was trying to cut back on her smoking habit. She also reported fibromyalgia problems and back and left shoulder pain. Plaintiff's lungs were clear and her respirations were even and unlabored. Her gait was normal and she had normal strength in her extremities. She exhibited pain to palpation of her left shoulder, but the joint was stable with a normal range of motion and no crepitus.[7] Dr. Chambers recommended that plaintiff exercise.

On January 12, 2010, plaintiff saw Dr. Chambers and complained of pain in her left shoulder, hands, low back, and right knee (Tr. at 344-346). She denied experiencing any pulmonary symptoms and had not been using Advair. She continued to smoke half a pack of cigarettes a day. She was in no acute distress, was alert and oriented, her behavior and affect were appropriate. Her lungs were clear and her respirations were even and unlabored. She exhibited pain to palpation of her left shoulder, but had no crepitus. Her internal rotation was limited, but she had normal extension and abduction.[8] Her gait was also normal. An x-ray of

---

[7]A clinical sign in medicine that is characterized by a peculiar crackling, crinkly, or grating feeling or sound under the skin, around the lungs, or in the joints. Crepitus in a joint can indicate cartilage wear in the joint space.

[8]

14

plaintiff's left shoulder showed a questionable irregularity at the insertion of the rotator cuff (Tr. at 342, 357).

On January 26, 2010, an MRI of plaintiff's left shoulder showed tendinopathy (an injury to the tendon) in the rotator cuff without evidence of a tear (Tr. at 340, 356). The MRI also showed a thickened irregular appearance to the labrum,[9] raising the possibility of a labral injury.

On February 9, 2010, plaintiff saw William Westler, M.D., to evaluate her shoulder pain (Tr. at 332-335). She said the pain began in August 2009, but she denied experiencing any related injuries. She was smoking one pack of cigarettes a day. On exam plaintiff had a full range of motion in her cervical spine and full mobility in her elbow, wrist, and hand. She had decreased scapula[10] mobility and an MRI of her left shoulder showed tendinopathy in the rotator cuff tendons without evidence of tearing. Dr. Westler assessed impingement syndrome of the left shoulder and gave plaintiff a steroid injection.

---

[9]


[10]


Case 6:11-cv-03272-REL   Document 15   Filed 06/11/12   Page 15 of 31

On February 11, 2010, plaintiff saw Robert Hufft, M.D., and complained of pain in her lower back, hip, leg, and knee (Tr. 366-368). She continued to smoke at least one pack of cigarettes a day. An x-ray of her knees was normal. An x-ray of her lumbar spine showed mild facet arthritis and advanced degenerative disc disease at L5-S1. Dr. Hufft assessed mild obesity, advanced degenerative disc disease, facet osteoarthritis of the lumbar spine, and chronic nicotine abuse. He recommended shoe lifts to improve plaintiff's back pain and right leg pain. He also recommended an epidural block.

On February 15, 2010, plaintiff saw Dr. Chambers and stated that her left shoulder pain had improved since having an injection (Tr. at 337-338). She reported increased fatigue since starting Lyrica (treats fibromyalgia). Plaintiff had not been taking her evening dose consistently; "she can't tell that it has helped any of her [symptoms] anyway". Plaintiff weighed 182 pounds. She was alert and oriented, in no acute distress, and her behavior and affect were appropriate. Dr. Chambers recommended that plaintiff stop taking Lyrica for one week to see if it had anything to do with her increased fatigue.

On March 8, 2010, plaintiff saw Sadie Holland, D.O., at the Center for Advanced Pain Management (Tr. at 362-363). Plaintiff reported smoking half a pack of cigarettes a day. Dr. Holland scheduled a lumbar epidural injection, and plaintiff received the injection two days later (Tr. at 360, 362, 364).

## C.      SUMMARY OF TESTIMONY

During the April 5, 2010, hearing, plaintiff testified; and George Horne, a vocational expert, testified at the request of the ALJ.

### 1.      Plaintiff's testimony.

At the time of the hearing, plaintiff had lived at her current address for 5 1/2 years with her 24-year-old son and her 15-year-old daughters (Tr. at 30).

Plaintiff has a high school education (Tr. at 30). Plaintiff owns a cleaning business which she started in 2000 (Tr. at 30-31). She has Medicaid (Tr. at 30).

Plaintiff suffers constant pain from fibromyalgia (Tr. at 31). Sometimes she cannot even raise up her arms (Tr. at 32). She suffers pain in her back and in all of her joints (Tr. at 31-32). Plaintiff's back pain radiates into her right leg to the knee (Tr. at 32). Plaintiff can stand less than a half hour before needing to sit down due to pain (Tr. at 32-33). She can sit for about 30 minutes before experiencing pain (Tr. at 33). Plaintiff estimated that she can lift five to ten pounds (Tr. at 33). She is able to carry a bucket containing cleaning supplies (Tr. at 33). She has trouble bending over to pick up something from the floor (Tr. at 33).

Plaintiff uses a massager or has someone press on the knots on her back to help relieve some of the pain and allow her to raise her arms (Tr. at 34). She cannot raise her arms up to get something out of the cabinet because of her shoulder pain (Tr. at 34). Plaintiff tries to lie down for pain relief (Tr. at 34). Plaintiff works two or three hours a day and sits down to or three times during that time (Tr. at 34-35). She spend the rest of her day lying down on the couch (Tr. at 35). She spends about half of an eight-hour day lying down (Tr. at 35).

Climbing stairs, walking, being outside in the air all make her breathing difficult (Tr. at 35). She does not know whether her walking or being around cleaning supplies interferes with her ability to breathe (Tr. at 35). Asked about medication side effects, plaintiff said her medicines may make her tired but she is not sure if the medication is causing that (Tr. at 36).

Plaintiff only sleeps four to five hours a night, and then she is tired all day (Tr. at 36). Her memory and concentration are affected by this (Tr. at 36). For example, she has to look at a schedule to know whose house she is supposed to clean each week (Tr. at 36-37). She takes breaks while she is cleaning houses, and her 26-year-old daughter helps her (Tr. at 37, 38). The daughter vacuums, mops, climbs up to clean high things (Tr. at 37). Plaintiff dusts and

wipes counter tops (Tr. at 37-38). Plaintiff works nine to ten hours a week (Tr. at 38). She has 10-12 households as clients (Tr. at 38).

Plaintiff cannot drive for very long (Tr. at 37). She drives about 30 miles per day (Tr. at 38-39). She goes to the grocery store about once a week (Tr. at 39). Plaintiff cooks once a day; she does laundry every two or three days (Tr. at 40). She does not attend very many of her daughters' school activities because she does not like to be around a lot of people in closed areas (Tr. at 40-41).

Plaintiff used to bowl two nights a week and go fishing every week, but she cannot do that now (Tr. at 39). She last bowled about three years earlier (i.e., about April 2007) and last went fishing about two and a half years ago (i.e., about October 2007) (Tr. at 39).

2.    **Vocational expert testimony.**

Vocational expert George Horne testified at the request of the Administrative Law Judge. The first hypothetical involved a person who had the limitations plaintiff described in her testimony (Tr. at 42). The vocational expert testified that such a person could not work because of the need for breaks and rests and the exertional limitations (Tr. at 42).

The second hypothetical involved a person who could stand and walk six hours per day; sit six hours per day; lift 20 pounds a day and 10 pounds frequently; occasionally bend, stoop, crouch, squat, kneel, and crawl; should avoid heights, extreme temperature, humidity, dust, fumes, and poor ventilation; and should avoid hazardous, unprotected, and moving equipment (Tr. at 42). The vocational expert testified that such a person could perform plaintiff's past relevant work as a rental clerk (Tr. at 42). The person could also work as a production assembler, DOT 706.687-010, with at least 1,000 in Missouri and 40,000 to 50,000 in the country, or a cashier II, DOT 211.462-010, with at least 1,000 in Missouri and 40,000 to 50,000 in the country (Tr. at 42-43).

18

The third hypothetical was the same as the second except the person would need to avoid high-stress work such as fast-paced activity, work that requires the person to meet explicit production quotas, deadlines or schedules or change in work settings. The person would have difficulty with jobs requiring a high level of concentration such as sustained precision or sustained attention to detail. The person would be able to carry out a simple routine or simple repetitive tasks. Finally, the person should not have frequent or prolonged personal interaction with the public (Tr. at 43). The vocational expert testified that such a person could not perform any of plaintiff's past relevant work (Tr. at 43). The person could perform the production assembler job, and the person could also be a small parts assembler, DOT 739.687-030, with at least 1,000 in Missouri and 40,000 to 50,000 in the country (Tr. at 43).

The fourth hypothetical was the same as the third except the person could only occasionally reach (Tr. at 44). The vocational expert testified that such a person could not work -- either constant reaching or contact with the general public would be required, and if the person cannot do either, then the person would not be employable (Tr. at 44).

The fifth hypothetical incorporated the limitations found by Joan Bender, Ph.D., i.e., that a person could not concentrate or persist on tasks for full-time work due to distraction from pain (Tr. at 44). Such a person would not be employable (Tr. at 44).

V.     *FINDINGS OF THE ALJ*

Administrative Law Judge David Fromme entered his opinion on May 21 2010 (Tr. at 12-21).

Step one. Plaintiff has not engaged in substantial gainful activity since her alleged onset date (Tr. at 14). She worked after her alleged onset date, but that work did not rise to the level of substantial gainful activity.

Case 6:11-cv-03272-REL   Document 15   Filed 06/11/12   Page 19 of 31

Step two.  Plaintiff has the following severe impairments:  fibromyalgia, left shoulder degenerative joint disease, lumbar spine degenerative disc disease, asthma, chronic obstructive pulmonary disease, depression, and anxiety (Tr. at 14).  Plaintiff's diabetes is not a severe impairment (Tr. at 15).

Step three.  Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 15).

Step four.  Plaintiff's subjective complaints are not entirely credible (Tr. at 16-19). Plaintiff retains the residual functional capacity to perform light work lifting 20 pounds occasionally and ten pounds frequently. She can stand and/or walk six hours a day and sit six hours a day.  She can occasionally bend, stoop, crouch, squat, kneel, and crawl. She must avoid heights, hazardous unprotected moving equipment, extreme temperatures, humidity, dust, fumes, and poor ventilation. She should avoid high stress work such as fast paced activities or work that requires explicit production quotas, deadlines, schedules, or changing work settings. She must avoid a high level of concentration such as sustained precision or sustained attention to detail, but is able to carry out a simple routine or simple repetitive tasks. She should not have frequent or prolonged personal interaction with the public (Tr. at 16).  The ALJ considered the limitations caused by plaintiff's obesity in assessing plaintiff's residual functional capacity (Tr. at 18).  With this residual functional capacity, plaintiff cannot return to any of her past relevant work (Tr. at 20).

Step five.  Plaintiff can perform other jobs available in significant numbers in the national and regional economy, such as production assembler, with 40,000 to 50,000 in the nation and 1,000 in the region, or small products assembler, with 40,000 to 50,000 in the nation and 1,000 in the region (Tr. at 21).  Plaintiff is therefore not disabled (Tr. at 21).

## VI.    CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible. Specifically, plaintiff argues as follows:

Starbuck did work part time after her disability onset date, but only with the assistance of others. She also did smoke in her past, but ceased smoking while still under the care and treatment of her medical providers. However, the ALJ repeatedly points out that Starbuck smokes and that she works as a reason Starbuck is not credible. Neither of these reasons in and of themselves disqualify her from being adjudged disabled because of all of her other limitations, yet it is clear that these two factors are given undue weight in the ALJ's decision to find her not credible.

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered: Treatment, other than medication, the individual receives or has received for relief of pain or

21

other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

> The claimant alleged an inability to work as of February 1, 2008 due primarily to physical conditions. She allegedly experiences constant pain that worsens with activity; she has shortness of breath that is worsened with activity; she has trouble sleeping at night which causes fatigue during the day; she is only able to work 9-10 hour per week with breaks; she can no longer bowl or fish due to her pain; she spends about half of a typical 8 hour day lying down; and she can only sit for 30 minutes, stand for less than 30 minutes, and lift or carry 5 pounds. The claimant has also alleged psychological symptoms and impairments that interfere with her ability to work. According to the claimant she has problems with her memory and concentration; she is unable to attend all of her daughters' school activities because of problems being around crowds of people and she occasionally has problems getting along with others and following instructions.

> The issue of credibility remains reserved to the Commissioner of the Social Security Administration. After careful consideration of the evidence, the undersigned finds that the claimant's descriptions of the symptoms and limitations are generally inconsistent and unpersuasive. Accordingly, the undersigned finds the claimant's statements are not credible to the extent they are inconsistent with the above residual functional capacity for the reasons explained below.

> The record documents the claimant has [sic] having a variety of physical and psychological diagnoses including fibromyalgia, lumbar spine degenerative disc disease, left shoulder degenerative joint disease, asthma, chronic obstructive pulmonary disease, depression, and anxiety; however, the clinical and objective findings in the record are inconsistent with allegations of total debilitation. With regard to her fibromyalgia and lumbar spine degenerative disc disease, the record indicates that the claimant reported these conditions and similar symptoms prior to her alleged onset of disability. According to the claimant in March 2010 her back pain began 31 years ago following a motor vehicle accident. Moreover, during the relevant time period there has been no documentation of a worsening in these conditions and her prescribed treatment and medications has [sic] remained fairly steady throughout the relevant time period with only minor adjustments and one very recent epidural steroid injection.

> With regard to her left shoulder, the claimant reported to orthopedist William Wester, M.D., that her shoulder pain did not really begin until August 2009, well after her alleged onset of disability and less than 12 months ago. Despite the claimant's allegations of debilitating pain and severe limitations, the record is devoid of any evidence showing a significant degree of muscle atrophy, muscle spasm, sensory or motor loss, reflex abnormality, gait disturbance, or significantly reduced range of

22

motion of the spine or joints. On examinations the claimant exhibits some pain to palpation, but she has adequate muscle strength and tone and her joints are normal to inspection, are stable, and have no crepitus. Moreover, the objective imaging has failed to reveal more than minimal findings. The claimant has not been prescribed pain modalities such as a TENS unit, back brace, or an assistive device for ambulation nor has the claimant required aggressive medical treatment, frequent hospital confinement, or surgical intervention to address her persistent pain nor have her providers placed restrictions on her activities.

As for the claimant's breathing disorders, the record documents treatment for asthma and chronic obstructive pulmonary disease. She has been hospitalized with pneumonia during the relevant time period and has had several exacerbations of symptoms. According to the claimant she continues to experience shortness of breath particularly with increased activity. However, when the claimant is not having an exacerbation of symptoms, her respirations are even and unlabored; her lungs are clear to auscultation; and she exhibits no wheezing, rhonchi, or crackles and her chest x-rays reveal no acute disease. Additionally, the claimant has exhibited noncompliance with her breathing medications, only using them intermittently. Mark Chambers, M.D., advised the claimant that she wold have progressive symptoms if she does not take her medications as directed. Further, the claimant has a long history of cigarette smoking upwards of one pack per day. She was advised on numerous occasions to stop smoking. Dr. Chambers further advised the claimant that as long as she smokes she will continue to have progressive symptoms.

* * * * *

The claimant has also been diagnosed with depression and anxiety, for which she has been prescribed psychotropic medications. However, the claimant has not received any psychiatric hospitalizations or specialized treatment. She has received her medications from a general practitioner who has not recommended specialized treatment or counseling. Furthermore, the overall evidence of record does not support the severity of psychological symptoms alleged by the claimant herein. First, her reports of symptoms have been inconsistent. At application she indicated having no problems getting along with others or following instructions. She later indicated problems getting along with others, trouble following instructions, and an inability to attend her daughters' school activities due to problems being around large crowds. Additionally, she has rarely reported psychological symptoms to her prescribing doctor nor has she reported to her doctor the severity of symptoms being alleged herein. Although the claimant has now alleged significant limitations with socialization, memory, and concentration, no providers have noted trouble in interacting with the claimant nor have they noted an inability to focus during an office visit; the claimant is also noted as a reliable historian despite her allegations of memory problems. Finally, on examinations the claimant is alert, oriented, and cooperative; she has an average rate of speech; she provides logical and goal-directed answers to questions; and she exhibits appropriate behavior and affect.

* * * * *

23

Considering the record as a whole, the claimant has not received the type of treatment indicative of disabling conditions. As discussed above, the claimant's objective findings have not been consistent with complete debilitation. Further, the claimant has exhibited a pattern of noncompliance. The claimant has been encouraged on numerous occasions to lose weight and implement a consistent exercise program. This indicates that the claimant's providers thought she was capable of a greater level of activity than being alleged herein. Nevertheless, the claimant has failed to implement an exercise routine, has continued to exhibit poor dietary habits, and has failed to lose weight. As discussed above, the claimant has also been encouraged to completely cease smoking cigarettes, which she failed to do as well. The claimant has also exhibited noncompliance with regard to her medications; on numerous occasions she has stopped using her medications, has reported not using her medications as prescribed, and has reported missing doses entirely. The claimant's daily activities are also generally inconsistent with total debilitation. She has exhibited the ability to work above the substantial gainful activity level in the past despite her impairments and she has worked part-time after her alleged onset of disability. While the work activity after her alleged onset date does not constitute disqualifying substantial gainful activity, it does indicate that the claimant's activity level may be greater than being alleged in connection with this application. Further, the claimant has reported the ability to take care of her children, prepare meals, perform household chores, handle her personal care, take care of pets, shop, drive, manage finances, watch television, play computer games, spend time with others, and read. Although the claimant testified that she has been unable to bowl in three years, she reported in May 2008 that she was bowling one night per week. She also reported at that time that on the weekends she may go to garage sales or flea markets and may go out to eat with her boyfriend.

(Tr. at 16-19).

A claimant's subjective allegations "may be discredited by evidence of daily activities inconsistent with such allegations." Davis v. Apfel, 239 F.3d 962, 967 (8th Cir. 2001). Here the ALJ noted that plaintiff reported taking care of her children and pets, going to flea markets and garage sales, playing computer games, shopping, spending time with others, and performing household chores. Some of these daily activities are inconsistent with plaintiff's subjective complaints of disabling symptoms. Medhaug v. Astrue, 578 F.3d 805, 817 (8th Cir. 2009) (cooking, vacuuming, washing dishes, doing laundry, shopping, and driving inconsistent with complained of disabling pain); Riggins v. Apfel, 177 F.3d 679, 693 (8th Cir. 1999). The ALJ also recognized that plaintiff made inconsistent statements about her ability to go bowling. Although she testified on April 5, 2010, that she had not bowled in three years, she told Dr. Bender in May 2008 that she went bowling every week. Despite telling Dr. Bender in

24

May 2008 that she bowled every week, just a few months later, in September 2008, plaintiff reported in her disability paperwork that she had not been bowling for the past year.

Plaintiff argues that there is no evidence in the record that she cared for pets or played computer games. However, in a questionnaire plaintiff completed on September 16, 2008, she reported playing computer games; and in a questionnaire she completed on July 15, 2009, she reported taking care of her pet. Plaintiff also reported shopping, going to flea markets and thrift stores, activities which the ALJ noted are inconsistent with plaintiff's subjective complaints of disabling symptoms.

Turning specifically to the Polaski factors, the ALJ properly recognized that plaintiff continued to work part time during her alleged period of disability. Plaintiff testified that she worked two to three hours a day cleaning houses with her daughter. She also reported on multiple occasions during her alleged period of disability, that she continued to work as a housekeeper. On December 1, 2008 -- ten months after her alleged onset date -- plaintiff reported to her doctor that she was using a new cleaning solution in an enclosed shower. The record establishes that plaintiff was actively cleaning rather than merely "scheduling" her daughter to clean houses as she testified.

Plaintiff also testified that her business had gone down by more than 50% due to her inability to do the physical cleaning. However, her earnings record does not reflect such a drop. Plaintiff earned approximately $11,000 in 2004, $10,000 in 2005, $12,000 in 2006, $12,000 in 2007, and in 2008, when plaintiff alleges she became disabled just 31 days after the year began, she still earned $12,000 -- the same as her earnings prior to her alleged onset date.

Plaintiff's daily activities are inconsistent with disability. She reported that she cleans for one to three hours each day for her business, she fixes dinner, cleans her kitchen, and straightens up her house. She cooks and does laundry for herself and her children, and she

25

takes care of a pet. She drives, shops, watches television, plays computer games, bowls, and goes fishing. She goes to garage sales and flea markets and eats at restaurants, which are inconsistent with her testimony that she avoids her daughters' school activities because she does not like to be around people. Although she claimed that she could only reach "one time per day" the records show that plaintiff was able to drive herself to her doctor appointments, which is inconsistent with her allegation in her disability paperwork because to drive one must necessarily reach forward to hold the steering wheel during the entire trip.

The medical records show that the intensity of plaintiff's symptoms was not as bad as she alleges in her disability case. On October 31, 2008, plaintiff was at the emergency room for breathing difficulties and denied having any musculoskeletal complaints. On November 5, 2008, she denied depress and musculoskeletal complaints. On December 1, 2008, plaintiff denied joint pain and muscular pain. On December 18, 2008, she denied respiratory complaints and musculoskeletal complaints. On April 7, 2008, she denied impaired function, joint pain, joint stiffness, muscle cramps, weakness, and back pain. Plaintiff rarely complained of pain to her treating doctors, but on September 29, 2008, she complained of fibromyalgia problems and back and left shoulder pain. Her treating doctor recommended exercise -- he did not prescribe any pain medications. He recommended ice, heat, weight loss, exercise, physical therapy, and over-the-counter Tylenol as needed. On February 11, 2010, plaintiff complained of lower back, hip, leg and knee pain. Dr. Hufft recommended shoe lifts to improve plaintiff's back and knee pain and an epidural block. He did not prescribe any pain medication. The medical record establishes that the duration, frequency, and intensity of plaintiff's symptoms are inconsistent with her allegations of disabling pain.

The record shows that plaintiff's poor habits were generally the precipitating and aggravating factors of her symptoms. Plaintiff told Dr. Chambers that she was using caffeine twice a day, but she complained in her disability paperwork of a difficulty sleeping. On July 7,

26

2009, plaintiff complained of blood sugar running high, but she was not taking her diabetes medication. She complained of ongoing chronic cough and wheezing, but she was not taking her Advair and continued to smoke. Dr. Chambers told plaintiff the right upper quadrant pain she complained about would resolve if she lost weight. The hospitalizations were for breathing difficulties; however, plaintiff continued to smoke and repeatedly stopped using Advair prior to her exacerbations. Although plaintiff points out that on one hospital visit she claimed to have stopped smoking, the very next visit with Dr. Chambers shows that plaintiff was still "trying" to stop. It is not plausible that she actually did stop smoking right before she went into the hospital but shortly after her discharge from the hospital she was trying to stop. The ALJ was justified in believing that plaintiff continued to smoke during the entire time she was being treated for lung issues. Even if plaintiff had stopped as she claimed, it would have been for no more than a month, because the records before that claim and the records after that claim both indicate that she was smoking.

Plaintiff was never prescribed strong pain medication. She was given nothing more than an occasional non-steroidal anti-inflammatory and an anti-depressant for her body pain. Her doses were not changed, and she had no side effects from her medications.

No doctor has ever restricted plaintiff's activities. In fact, the record shows it was the opposite. On July 31, 2007, Dr. Chambers recommended plaintiff exercise. On January 28, 2008 -- three days before her alleged onset date -- Dr. Chambers recommended an exercise program to help plaintiff's fibromyalgia, but she was not interested. On April 28, 2008, Dr. Chambers recommended plaintiff exercise. On October 17, 2008, Dr. Chambers recommended that plaintiff exercise. On January 12, 2009, Dr. Chambers recommended that plaintiff exercise. On April 7, 2009, Dr. Chambers recommended that plaintiff exercise. On July 7, 2009, Dr. Chambers recommended that plaintiff exercise. On September 29, 2009, Dr. Chambers recommended that plaintiff exercise. Because no doctor has recommended that

Case 6:11-cv-03272-REL   Document 15   Filed 06/11/12   Page 27 of 31

plaintiff limit her activities in any way, and because her treating doctor consistently told her to exercise regularly, the record on this factor supports the ALJ's finding that plaintiff's allegations of disability are not credible.

In addition to the above, the record shows that plaintiff's medical exams were consistently normal. On July 18, 2008, her physical exam was normal. On December 1, 2008, she had normal strength in her extremities and a normal echocardiogram. On January 12, 2009, she had normal strength and range of motion I her back and extremities. On April 7, 2009, she had normal strength and range of motion in her back and extremities. On July 7, 2009, she had normal strength and normal range of motion in her back and extremities. Plaintiff complained of fibromyalgia symptoms on only four doctor visits after her alleged onset date: April 28, 2008, October 17, 2008, April 7, 2009, and September 29, 2009. On all four occasions, plaintiff's treating physician told her to exercise. He did not prescribe pain medication.

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's subjective complaints of disabling symptoms are not credible.

## VII.    DR. JOAN BENDER

Plaintiff argues that the ALJ erred in failing to give controlling weight to the opinion of Joan Bender, Ph.D.

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques. Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005). If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give the opinion: (1) the length of the

treatment relationship, (2) frequency of examinations, (3) nature and extent of the treatment relationship, (4) supportability by medical signs and laboratory findings, (5) consistency of the opinion with the record as a whole, and (6) specialization of the doctor. 20 C.F.R. § 404.1527(d)(2) - (5).

The ALJ had this to say about Dr. Bender, a psychologist whom plaintiff saw one time in connection with her application for medical assistance:

> In May 2008 the claimant was sent to a consultative examination with Joan Bender, Ph.D., to determine eligibility for medical assistance. Based on her examination of the claimant, Dr. Bender opined that the claimant was disabled for full time work. Dr. Bender's opinion has been given little weight for multiple reasons. First, a statement by a medical source that the claimant is "disabled" or "unable to work" does not mean that the claimant will be found disabled as that term is defined in the Act. The final responsibility for deciding the ultimate issue of disability is reserved to the Commissioner. Moreover, Dr. Bender indicated that the claimant was disabled due to pain and trouble with movement. She specifically indicated that the claimant's psychiatric disorders were not disabling in and of themselves and that pain was the claimant's primary problem in terms of disrupting her functioning. Dr. Bender is a clinical psychologist; thus, assessment of pain and difficulties with movement are outside the area of her expertise and a finding that the claimant's pain so limits the claimant that she would be completely unable to concentrate or persist even on simple instructions is inconsistent with the overall evidence of record. Therefore, little weight has been given to Dr. Bender's conclusory opinion as to the ultimate question herein. Her assessment of claimant's ability to understand and remember instructions, to interact socially, and adapt to change are consistent with the other evidence as well as with her clinical findings and are entitled to weight.

(Tr. at 19).

First, Dr. Bender is not a treating physician as plaintiff argues. Dr. Bender saw plaintiff one time in connection with her application for government assistance. The Eighth Circuit has consistently held that the opinion of a one-time consultant is not entitled to controlling weight. Clark v. Apfel, 141 F.3d 1253, 1256 (8th Cir. 1998); Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998); Loving v. Department of Health & Human Services, 16 F.3d 967, 971 (8th Cir. 1994).

29

Additionally, Dr. Bender is not a medical doctor, she did not perform any tests dealing with plaintiff's physical condition, she had none of plaintiff's prior records for review, and her opinion is inconsistent with the medical evidence of record. The only tests performed by Dr. Bender were for a mental impairment, and she found that plaintiff did not qualify for medical assistance based on her psychological condition. Her finding that plaintiff was disabled due to pain is based on nothing but plaintiff's own statements. However, plaintiff denied pain in most of her visits with her treating physician, Dr. Chambers. Even when she did complain of pain, she was treated with only anti-depressants or anti-inflammatories -- which is not indicative of disabling pain.

Plaintiff argues that the ALJ incorrectly found "that the analysis of Dr. Bender was of no value in evaluating Starbuck's mental impairments". This is not correct, however. The ALJ stated that Dr. Bender's assessment of plaintiff's ability to understand and remember instructions, to interact socially, and adapt to change was consistent with the other evidence as well as with her clinical findings and was entitled to weight.

An ALJ may properly discount an opinion that is inconsistent with or contrary to the medical evidence of record. Halverson v. Astrue, 600 F.3d 922, 930 (8th Cir. 2010); Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007). In this case, the ALJ properly gave no weight to Dr. Bender's opinion that plaintiff was disabled due to a physical impairment. She is not a medical doctor, she was not a treating doctor, she administered no tests other than for a mental impairment that she found was not disabling, she relied solely on plaintiff's subjective complaints of pain which were markedly different than her complaints of pain to her treating doctors, and her opinion was conclusory. Therefore, the ALJ properly gave it no weight.

A plaintiff's residual functional capacity as assessed by the ALJ need only include the limitations found credible by the ALJ, not all of the claimant's alleged limitations. Owen v. Astrue, 551 F.3d 792, 801-802 (8th Cir. 2008). The ALJ properly found plaintiff's subjective

complaints of disabling symptoms not credible, none of plaintiff's treating physicians limited her activities in any way (in fact, her treating physician continually told plaintiff to exercise), she was not treated for a mental impairment other than with anti-depressants (she never participated in counseling, did not see a mental health professional, was never hospitalized for mental symptoms). A lack of significant restrictions imposed by treating physicians is properly relied upon by an ALJ. Brown v. Chater, 87 F.3d 963, 964-965 (8th Cir. 1996).

I find that the ALJ's residual functional capacity assessment is supported by the credible evidence in the record.

## VIII. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's decision finding plaintiff not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
June 11, 2012